UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

Norberto Medina-Rodriguez

    Plaintiff

v.

[1] Farmacia Medina, Inc.

[2] Farmacia Medina Num 2, Inc.

 [3] John Doe

    Defendant(s)

**CIVIL ACTION**

3:17-cv-01672-FAB-BJM

## AMENDED COMPLAINT AS A MATTER OF COURSE

1.    This is a civil rights action by plaintiff Norberto Medina Rodriguez ("Plaintiff") for discrimination at the building, structure, facility, complex, property, land, development, and/or surrounding business complex known as:

        Farmacia Medina
        Villas de Loiza
        Calle 1 Bloque 1
        Loiza PR 00745
        18.380174, -65.872083
        (hereafter "the Facility")



2.     Plaintiff seeks injunctive and declaratory relief, attorney fees and costs, against FARMACIA MEDINA NUM 2, INC. and JOHN DOE, a for-profit corporation(s) incorporated under the laws of Puerto Rico (hereinafter collectively referred to as "Defendant" or "Defendants"), pursuant to the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 et seq.) ("ADA").

## JURISDICTION

3.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 for ADA claims.

4.     Plaintiff's claims are authorized by 28 U.S.C. §§ 2201 and 2202.

## VENUE

5.     All actions complained of herein take place within the jurisdiction of the United States District Court for the District of Puerto Rico, and venue is invoked pursuant to 28 U.S.C. § 1391(b), (c).

6.     Defendants own, operate, and/or lease the Facility, and consist of a person (or persons), firm, and/or corporation. Co-Defendant Farmacia Medina Num. 2, Inc. is an owner or operator of the Facility. See Docket No. 20-2.

7.     Plaintiff is a Puerto Rico resident, lives in Carolina, Puerto Rico, is *sui juris*, and qualifies as an individual with disabilities as defined by the ADA. Plaintiff is severely limited or unable to engage in the major life activity of sitting, standing, and walking. Prior to instituting this action, Plaintiff suffered from a "qualified disability" under the ADA, a permanent walking abnormality, that is, abnormal, uncontrollable walking patterns (unsteady gait) because of a leg injury and bone damage. The Puerto Rico Department of Motor Vehicles issued a permanent handicap permit (No. 2015982 – parking spaces) to the Plaintiff.

2

## FACTS

8.    The Facility is a public accommodation facility, open to the public, which is intended for nonresidential use and whose operation affects commerce. Plaintiff lives in Carolina, Puerto Rico, approximately 18 minutes away from the Facility by motor vehicle. Prior to instituting this action, Plaintiff visited the Facility over two (2) times.

9.    Plaintiff visited the Facility and encountered barriers (both physical and intangible) that interfered with, if not outright denied, Plaintiff's ability to use and enjoy the goods, services, privileges and accommodations offered at the Facility. Plaintiff personally encountered the following barriers at the Facility during Plaintiff's visit to the Facility in January 2017, among others. At the time of the filing of this civil action, Plaintiff is personally aware the following barriers at the Facility remain in place and constitute a determent to access:

   a) Plaintiff found that the parking space was sloped, making it unnecessarily difficult for Plaintiff to transition from the passenger side of his vehicle to the access aisle, and vice versa. Possible solutions:  Regrade to 1:20 maximum slope or to the maximum extent that it is readily achievable.

   b) Plaintiff found that the built-up curb ramp projects into the access aisle in violation of Section 4.6.3.  If the parking space is not in the same level as the sidewalk, as here, a curb ramp will be required to access it. One of the most common mistakes that occur with curb ramps is locating them, as here, within the access aisle of the parking space. Access aisles are required to have a 2% slope in all directions. Because the curb ramp at Farmacia Medina is located in the access aisle, there is a violation to Section 4.6.3.  Possible solution: relocate the ramp.

c) The point of sale counter at the Facility was extremely narrow, leaving insufficient room for Plaintiff to use the counters to conduct transactions. Possible solutions: widen counter to the maximum extent that it is feasible.

d) The service counter at the Facility was extremely high. Accordingly, Plaintiff feel deterred from conducting any transactions at the service counter. Possible solutions: lower counter to the maximum extent feasible.

10. The barriers identified in paragraph 9 herein are only those that Plaintiff personally encountered. It is Plaintiff's intention to have all barriers which exist at the Facility and relate to his disabilities removed to afford his full and equal access. Specifically, Plaintiff is aware of the following barriers which exist at the Facility and relate to his disabilities:

a) This property fails to comply with section with: total number of parking space, ADA Section 208 – Table 208.2. Three purportedly accessible parking spaces are provided for this purpose in the front of the Facility. However, none are ADA compliant and thus, the minimum number of accessible parking spaces is not met. Possible solution: restriping of parking spaces without much burden or expense.

b) This property fails to comply with: Parking Sign. ADA compliant van-accesible parking signage is inexistent. Possible solution: install signage without much burden or expense.

c) This property fails to comply with: *Location of accessible parking spaces*. Accessible parking spaces must be located on the shortest accessible route of travel to an accessible facility entrance. Possible solution: relocate parking space.

d)  A properly configured route of travel is not provided from the purportedly accessible parking spaces to the building entrance. Possible solution: provide an accessible route to the maximum extent that it is feasible.

e)  A properly configured accessible route is not provided from the designated accessible parking and public right of way to the designated accessible building entrance. Possible solution: provide an accessible route to the maximum extent that it is feasible.

f)  Proper clear floor area is not provided at fire extinguisher. Possible solution: move objects or extinguisher to provide the required clear floor area.

g)  Proper clear floor area and maneuvering space is not provided at receiving counter. Possible solution: move objects, relocate counter, or provide another counter to provide the required clear floor area.

h)  Items on receiving counter (including merchandise placed on counter for pickup by customers) exceed maximum allowable height and depth for side reach. Possible solution: establishment of policies and procedures to avoid placement of movable property, such as merchandise, improperly places on the counter.

i)  Point of sale counter (prescription drugs area) exceeds maximum allowable height. Possible solution: lower counter.

j)  Items on point of sale counter exceed maximum allowable height and depth for side reach. Possible solution: modify counter to provide the required space.

k)  Proper identifying signage is not provided at designated accessible exit. Possible solution: provide signage.

11.     Plaintiff was, and continues to be, deterred from visiting the Facility because Plaintiff knows that the Facility's goods, services, facilities, privileges, advantages, and accommodations were and are unavailable to Plaintiff due to Plaintiff's physical disabilities.

12.     Plaintiff has knowledge of the barriers described and is currently deterred from patronizing defendant's business due to defendant's failure to comply with the ADA. Plaintiff plans to avail himself of the goods and services offered to the public at the property and will return to the Facility once the barriers are removed. Plaintiff believes that the barriers constitute a deterrent to his use of the facility, because it renders it more difficult for him to enter the facility and avail himself to the goods and services offered to the public at the Facility.

13.     Defendants knew, or should have known, that these elements and areas of the Facility were inaccessible, violate federal law, and interfere with (or deny) access to the physically disabled. Moreover, Defendants have the financial resources to remove these barriers from the Facility (without much difficulty or expense), and make the Facility accessible to the physically disabled. To date, however, Defendants refuse to either remove those barriers alleging that Plaintiff does not have the right to demand ADA compliance.

14.     At all relevant times, Defendants have possessed and enjoyed sufficient control and authority to modify the Facility to remove impediments to wheelchair or walker access and to comply with the 2010 Standards for Accessible Design. Defendants have not removed such impediments and have not modified the Facility to conform to accessibility standards. Defendants have intentionally maintained the Facility in its current condition

6

and have intentionally refrained from altering the Facility so that it complies with the accessibility standards.

15.   Plaintiff further alleges that the (continued) presence of barriers at the Facility is so obvious as to establish Defendants discriminatory intent. On information and belief, Plaintiff avers that evidence of this discriminatory intent includes Defendants' refusal to adhere to relevant building standards; disregard for the building plans and permits issued for the Facility; conscientious decision to maintain the architectural layout (as it currently exists) at the Facility; decision not to remove barriers from the Facility; and allowance that Defendants' property continues to exist in its non-compliance state. Plaintiff further alleges, on information and belief, that the Facility is not in the midst of a remodel, and that the barriers present at the Facility are not isolated (or temporary) interruptions in access due to maintenance or repairs.

16.   As one of the compromises involved in Congress passing and then President George H.W. Bush signing the ADA into law in 1990, enforcement of Title III, the public accommodation section, is almost entirely by private lawsuits. Although the U.S. Department of Justice has jurisdiction to enforce the ADA, there are no administrative agencies or federal "building inspectors," and no costly bureaucracy to enforce the law, an economic factor that was appealing to both to "conservatives" (and "liberals," to some extent) in 1990. Passage of the ADA in 1990 was a compromise in this respect: attorney fees were made awardable per Section 505 to a prevailing disabled plaintiff, to encourage private attorneys to handle enforcement actions, rather than putting in place a potentially expensive bureaucracy to enforce this law.  Encouraging competent attorneys to handle ADA Title III cases is necessary for effective enforcement of the law, as the U.S.

Department of Justice has generally not involved in individual plaintiff cases, or enforcement of the "readily achievable" standard, at least not in Puerto Rico.   The importance of <u>encouraging</u> ADA Title III cases, and recognition that ADA carry out an important role as private attorney general, was underscored by Northern District Chief Judge Thelton Henderson in <u>Walker v. Carnival Cruise Lines</u>, 107 F. Supp. 2d 1135, 1140 (N.D. Cal. 2000):

> *There can be no question that the Americans With Disabilities Act, passed in 1990, established as law the nation's interest in eradicating the bigotry and barriers faced by individuals with disabilities. 42 U.S.C. § 12102 et. seq. (hereafter "ADA"). In fact, the ADA states its first goal as being "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." See 42 U.S.C. § 12101(b)(1) (1999). The ADA creates the possibility that successful plaintiffs may establish permanent changes in the design and physical configuration of structures to better accommodate the disabled. 42 U.S.C. § 12101(a)(5). The benefits of such changes clearly redound not only to the plaintiffs themselves, but to similarly situated disabled persons, and the entire society at large. <u>As a result, plaintiffs or plaintiff classes who bring suit pursuant to the ADA do so in the role of "private attorneys general" who seek to vindicate "a policy `of the highest priority.'"</u> See Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648. See also Bruce v. City Of Gainesville, Ga., 177 F.3d 949, 951 (11th Cir.1999) (discussing ADA plaintiffs as private attorneys general); Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 11 (1st Cir.1999);*

> *For example, <u>successful ADA plaintiffs confer a tremendous benefit upon our society at large</u>, in addition to the attainment of redress for their personal individual injuries, successful ADA plaintiffs, like plaintiffs under Title VII, are entitled to 42 U.S.C. section 1988's fee shifting provision. See 42 U.S.C. § 1988. As the Eleventh Circuit recently has explained,*

>> *"[i]n Title VII cases as well as cases under the ADA, <u>the enforcement of civil rights statutes by plaintiffs as private attorneys general is an important part of the underlying policy behind the law</u>. Such a policy <u>ensures an incentive</u> for `impecunious' plaintiffs who can ill afford to litigate their claims against defendants with more resources...."*

The United States Department of Justice has also supported the necessity of private suits under the ADA:

Private plaintiffs play an important role in enforcing the ADA, particularly in the area of

public accommodations, which includes a large number of entities. See 42 U.S.C. 12188(a)(1). **The United States could not investigate every place of public accommodation in the country to determine if it is in compliance with the ADA.** Effective enforcement of Title III, therefore, depends upon a combination of suits by the United States and litigation by individuals with disabilities who are aware of and encounter violations in their local communities. **The United States therefore has an interest in ensuring that the standing of private plaintiffs to sue under Title III is not unduly restricted**. {From U.S. Department of Justice amicus brief in <u>Chapman v. Pier 1 Imports (US), Inc.</u>, 631 F.3d 939 (9th Cir. 2011).  The U.S. Department of Justice amicus brief in <u>Chapman</u> is available at:

<u>https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/chapman.pdf</u>

17.    Plaintiff is subject to preliminary screening pursuant to 28 U.S.C. § 1915(e) after his or her motion for leave to proceed without prepayment of fees is granted. <u>Audette v. Tiverton Housing Authority</u>, Civil No. 17-133S (D.R.I. May 1, 2017) ("Having granted IFP status, I am required by statute to further review Plaintiff's Complaint *sua sponte* under 28 U.S.C. § 1915(e)(2)").  Once the in forma pauperis status is granted to the Plaintiff, preliminary screening is mandatory under 28 U.S.C. § 1915(e)(2). Consequently, when a plaintiff seeks to file a complaint without prepayment of the filing fee, summonses do not issue until the court reviews the complaint and determines that it satisfies the substantive requirements of 28 U.S.C. § 1915.   However, there is no statutory authority action pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) to dismiss when the Plaintiff pays the filing fee, rather than requesting permission to proceed in forma pauperis.

18.    <u>Consolidation.</u>  **Here, there is no motion for leave to proceed in forma pauperis before the Court.** Thus, there is no common matter to consolidate under Fed. R. Civ. P. 42(a)(1) that will promote efficiency and economy or that will avoid conflicting decisions. Each ADA case is unique that involves a different factual and legal dispute,

different properties, different owners (landlords) and operators (tenants). Each property must be examined for ADA compliance as part of the litigation and different standards apply depending on the date of the construction or alterations to the property. Similarly, standing is not a common issue of fact or law in each case. Even if the Court determines that a plaintiff does not have a right to demand ADA compliance and dismisses an action involving a facility, that does not mean that said plaintiff does not have standing to ask ADA compliance in *any* facility. Similarly, if Plaintiff A does not have a right to demand ADA compliance in *any* facility, *arguendo*, that does not support a conclusion that Plaintiff B does not have standing to ask ADA compliance in *any* facility. In other words, the issue of standing is a disputed issue of law and fact in virtually all cases brought under Title III of the ADA. This true not only in the District of Puerto Rico, but nationwide for decades. For example, there should be no major issues concerning an ADA plaintiff's standing to sue the nearest supermarket from his or her home, but standing issues would certainly arise concerning a plaintiff's ability to buy gas in a gas station located 75 miles away in an area that he or she does not frequently visit. Similarly, a plainiff's standing to sue Plaza Las Americas, for example, differs from the analysis of his or her standing to sue Macy's Union Square (San Francisco, California), particularly if he or she has never been in California and does not intent to travel to San Francisco, California. But proximity is not determinant, because a plaintiff will likely travel from the Puerto Rico metropolitan area to Cabo Rojo, Puerto Rico to stay in a hotel, but not *merely* to buy gas. The above examples show that a plaintiff's standing to sue under Tittle III of the ADA requires a fact-intensive, case-by-case analysis, rather than rule-based approach.

19.   Number of Prior Lawsuits. In <u>D'lil v. Best Western Encina Lodge & Suites</u>, 538 F.3d

1031, 1040 (9th Cir. 2008), the Court warned against "the attempted use of past litigation

to prevent a litigant from pursuing a valid claim in federal court":

> The attempted use of past litigation to prevent a litigant from pursuing a valid claim in federal court warrants our most careful scrutiny. See, e.g., <u>Outley v. City of New York</u>, 837 F.2d 587, 592 (2d Cir. 1988). This is particularly true in the ADA context where, as we recently explained, the law's provision for injunctive relief only "removes the incentive for most disabled persons who are injured by inaccessible places of public accommodation to bring suit.... As a result, most ADA suits are brought by a small number of private plaintiffs who view themselves as champions of the disabled.... For the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA." <u>Molski v. Evergreen Dynasty Corp.</u>, 500 F.3d 1047, 1062 (9th Cir.2007) (citing Samuel R. Bagnestos, The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation, 54 U.C.L.A. L.Rev. 1, 5 (2006)). Accordingly, we must be particularly cautious about affirming credibility determinations that rely on a plaintiff's past ADA litigation.

Defendants' attempts to argue that this case was abusive, brought in bad faith, frivolous,

or malicious is representative of a troubling trend in which disability access defendants

attack the motives of plaintiffs and their counsel in nearly <u>any case</u> brought to enforce the

right to equal access guaranteed by the ADA. While many defendants seem to suggest

that a plaintiff's meritorious claims are annoying, difficult for businesses, or otherwise

objectionable,[1] that is an argument for the legislature, not the Courts. The court in <u>Kittok</u>

<u>v. Leslie's Poolmart, Inc</u>., 687 F. Supp. 2d 953, 959 (C.D. Cal. 2009) addressed this very

argument by observing:

---

[1]   There are many myths and misconceptions regarding accessibility lawsuits. See e.g. https://www.ada.gov/pubs/mythfct.txt. See also, <u>Enforcement Activities</u> of the U.S. Department of Justice: https://www.ada.gov/enforce_current.htm#TitleIII.

> The persistence of plaintiffs in bringing multiple lawsuits alleging unequal access to places of public accommodation does not demonstrate wrongdoing by plaintiffs any more than it shows a hesitation of businesses to comply with the law. . . [ ] For the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA.

Id. at 959 (quoting Evergreen Dynasty Corp., 500 F.3d 1047, 1062 (9th Cir. 2007)) (internal quotation marks omitted); Campbell v. Moon Palace, Inc., No. 11-60274-CIV, 2011 WL 3648562, at * 5 (S.D. Fla. Aug. 19, 2011) (same). Plaintiff is not stripped of standing by virtue of the number of lawsuits he has filed. Campbell, 2011 WL 3648562, at * 5. See also Jankey v. Poop Deck, 537 F.3d 1122, 1132 (9th Cir. 2008) (disapproving of district court's denial of fees in part based on "Plaintiff's counsel's numerous other lawsuits in the Central District of California [as] those cases are not a part of the record here."); Wilson v. Pier 1 Imports (US), Inc., 411 F.Supp.2d 1196, 1199 (E.D.Cal.2006) (finding record of litigiousness did not establish bad faith on part of plaintiffs).

See also, Lugo v. 141 NW 20th Street Holdings, LLC, Civil No. 12-10440 (S.D. Fla Jun 29, 2012) (rejecting defendant's accusation that Plaintiff "cut-and-paste list" of violations, taken from other ADA complaints filed by Plaintiff undermined his standing to sue).  Similarly, in Segal v. Rickey's Restaurant and Louge, Inc., Civil No. 11-61766 (S.D. Fla. Jun 25, 2012) the Court noted:

> The Court is not persuaded by Defendant's assertion that Plaintiff, by filing multiple lawsuits, is "pervert[ing]" the ADA and is a "pawn" for the generation of attorney's fees. Instead, the Court notes that filing suit to remedy architectural barriers constitutes a "legal recourse to redress [ ]discrimination" and allows the disabled to "fully participate in all aspects of society" 42 U.S.C. § 12101(a)(1) and (4). Furthermore, the ADA authorizes a court, in its discretion, to "allow the prevailing party, other than the United States, a reasonable attorney's fee . . ." 42 U.S.C. § 12205 (emphasis added). Should

Plaintiff prevail, Defendant is not prevented from arguing that Plaintiff should not recover attorney's fees.

20.   Use of Prior Complaints as Templates.  The use of prior lawsuits as templates in litigation is common in many areas of law, such as foreclosure litigation, collection, landlord/tenant disputes, corporate law, family law, and torts. In fact, the U.S. District Court of the District of Puerto Rico, through Pro Se Forms available online to the public,[2] provides templates of complaints for employment discrimination,[3] Section 1983 litigation, habeaus corpus, and general civil litigation.[4] For over two decades, litigants in accessibility lawsuits have been using templates nationwide.   It is correct that Plaintiff's pleading is based on a prior template, but the claim is sufficiently pled, supporting the relief requested under Rule 8 of the Federal Rules of Civil Procedure.   Owners of properties –landlords– and operators of businesses –tenants– who have made no attempt to comply with the ADA will almost always violate the same mobility-related ADA sections. The ADA contains various requirements designed specifically to assist individuals with mobility-related issues. If the facility was not, assessed, built or renovated to conform to the ADA's requirements, it would be fortuitous if the facility did not violate these various mobility-related ADA sections. If these violations exist, it would be unusual for a disabled person and not encounter the problems stemming from the violations. The undersigned does not attempt to create artificial distinctions between the violations that different ADA clients of the undersigned encounter at different non-compliant facilities and therefore the various Complaints dealing with these facilities

---

[2] http://www.prd.uscourts.gov/?q=pro-se-forms
[3] http://www.prd.uscourts.gov/sites/default/files/documents/17/Employment_Discrimination_Complaint_Form.pdf.
[4]   "General Complaint Form" provided by the U.S. District Court for the District of Puerto Rico. http://www.prd.uscourts.gov/sites/default/files/documents/17/Civil_Complaint_Form.pdf   (Accessed on July 27, 2017).

usually contain similar lists of violations. See e.g. <u>Loskot v. D & K Spirits, LLC</u>, No. 2:10-cv-0684-WBS-DAD, 2011 WL 567364 at *3 (E.D. Cal. Feb. 15, 2011) (noting that, although "plaintiff's complaint is largely boilerplate, it is sufficient to support the requested relief" under the ADA for purposes of default judgment). The disabled, like plaintiff, continuously visit many places during his or her life. Many others suffer accessibility discrimination but are not willing or do not know how to fight for their own rights. Those who seek to promote change and point out those who violate federal law should not be required to draft a new complaint from scratch for every lawsuit as the "price" for invoking their rights.  Not only it would be a miscarriage of justice, it would result in waste of private resources. For example, because a plaintiff can provide notice of the claim under Rule 8 in a cost-effective manner by using prior complaints as a template, defendant is required to pay <u>less</u> in statutory attorney fees and costs. The use of templates promotes access to justice, promotes judicial efficiency, and maximizes the use public resources in a cost-effectively manner, as it allows the Court to be a proactive player in the much-needed transformation that is required in Puerto Rico for the benefit of the disabled community. Plaintiff very respectfully submit that the use of templates in civil rights litigation should be *encouraged* by the Court in accessibility lawsuits.  Today, 27 years after the Americans with Disabilities Act (ADA) was signed into law on July 26, 1990, a significant number of facilities egregiously fail to with the standards in Puerto Rico. The small number of lawsuits under Title III of the ADA by pro se parties or parties represented by counsel since 1990 does not represent that there are no architectural barriers in Puerto Rico. In fact, lack of enforcement promotes even more barriers and unfair competition between those sensible businesses that consider the law and those

businesses who simply ignore it or fail to take commonsense-based measures to provide

access.  It shows that state and federal courts need to be increasingly accessible to the

disabled. A strong, democratic civil justice system is critical to safeguarding individual

rights and promoting public health, equal treatment, and safety for the disabled.

21.    <u>Retaliation Against ADA Plaintiffs by the Defendant</u>. Section 12203(b) provides,  in

relevant part, as follows:

> (b) Interference, coercion, or intimidation
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual
> in the exercise or enjoyment of, or on account of his or her having exercised or
> enjoyed, or on account of his or her having aided or encouraged any other
> individual in the exercise or enjoyment of, any right granted or protected by this
> chapter.
> 42 U.S.C. § 12203(b).

This section prohibits "harassment against those who are simply exercising their ADA

rights." <u>Castillo-Antonio v. Natalie Esperanza</u>, Civil No. 13-5256 (N.D. Cal. Jan 22,

2015)(quoting <u>Wilson v. Murillo</u>, 163 Cal. App.4th 1124, 1138 (2008)). No disabled

person should be required to divulge in discovery (or any other special proceeding) the

details of every other ADA lawsuit ever brought, as the "price" for prosecuting an action

to enforce the ADA. To order a plaintiff to be subjected to this intrusion solely based on

having filed more than one ADA action, and being accused of thereby of being a

"professional plaintiff," would be unfair and a miscarriage of justice and a potential

violation to § 12203(b). This may be an appropriate situation to enforce a rule necessary

to protect the enforcement of the ADA in light of the attacks by Defendant at Docket No.

18-20. This is supported by § 12203's prohibition against retaliation: that no disabled

person who files a "meritorious" ADA lawsuit should have to later face questioning about

"that suit" as the price for filing any other ADA action. As matter of policy under §

12203, that the fact of plaintiff filing —and wining— <u>other</u> ADA lawsuits is not admissible at trial. Also, there is another practical reason to prohibit in effect re-litigation of ADA lawsuits. Aside from the constitutional and § 12203 issues, if evidence of other lawsuits were introduced at all, plaintiff would have the right to disclose all relevant facts of the lawsuits, their objectives, and results in each case. The expenditure of time to deal fairly with the full merits of multiple previous meritorious lawsuits under the ADA would be phenomenal. Re-litigation of each previous meritorious lawsuit under the ADA would be a waste of the Court's time and resources, and this is particularly true in many cases where there is a settlement agreement to the satisfaction of the parties, modifications were made at the property, and the defendant in those cases do not claim that the lawsuit was legally frivolous or malicious. It is also noteworthy that in many other cases there is a Settlement Agreement in which the Defendant agrees to comply with the law; or the fact of compliance is stipulated after structural modifications to the property; or there is a remedial plan to cure any outstanding deficiency –which negates any claim that the action was legally frivolous.  It is well-known that there are systematic barriers to access in Puerto Rico in thousands of businesses and government facilities in Puerto Rico. As result of different approach in education, policy, and enforcement by the Commonwealth of Puerto Rico, coupled with many landlords and businesses failure to proactively research the law or take commonsense-based measures to increase access, there are more architectural barriers in Puerto Rico than in the contiguous United States. Not only there are relatively more barriers in Puerto Rico, the violations are worse, more egregious. No registered architect is needed to conclude that the level of compliance in states like Florida, Texas, Arizona, New Mexico, Virginia, D.C., Chicago, New York, or California

is relatively superior to the level of compliance with accessibility laws in Puerto Rico, which is why *some* ADA accessibility action in *those* jurisdictions are for minor violations, i.e. a landlord or tenant sued because a bathroom mirror is an inch too high. Given this scenario, why would a plaintiff in Puerto Rico procure to file lawsuits for minor violations when it is undeniable that there is a "sea" of egregious violations to federal law in Puerto Rico?  What is more, as matter of reality from the perspective of the Plaintiffs' bar,[5] there is little or no incentive to file a lawsuit for a ridiculously minor violation. If there if a ridiculously minor violation and a lawsuit is filed, the violation may be quickly corrected, and the action becomes moot without the possibility of reimbursement of the filing fee or statutory attorneys' fees.

22.    No prior notice to the defendant or state authorities about the ADA issues was provided and such notice is not required under the law. In Medina-Rodriguez v. Fernandez Bakery, Inc. et al, Civil No. 16-2578 (FAB) (D.P.R. June 14, 2017), the Court denied defendant's motion to dismiss for, among others, alleged failure to exhaust administrative remedies. Judge Besosa is not alone in his ruling; the majority of courts across the country addressing this issue have come to the same conclusion that Title III of the ADA does not incorporate the notice requirement of Title II of the Civil Rights Act. See, e.g., Hermanson, 1997 WL 33471624, at 3-4; Botosan v. Paul McNally Realty, 216 F.3d 827, 831 (9th Cir. 2000) ("§ 12188(a)(1) does not implicitly incorporate § 2000a-3(c). A plaintiff in a private Title III action is not required to provide notice to any state or local agency as a prerequisite to filing suit.") (collecting cases); Burkhart v. Widener Univ., Inc., 70 F. App'x 52, 54 (3d Cir. 2003) ("The District Court here adopted the same

---

[5] Plaintiff's counsel makes this statement solely on his own behalf, not on behalf of the plaintiffs' bar.

reasoning [in Botosan], and we will do so as well."); <u>Wyatt v. Liljenquist</u>, 96 F. Supp. 2d 1062, 1064 (C.D. Cal. 2000) ("By its express terms, the ADA adopts only Section 2000a-3(a), which says nothing about notice or exhaustion of remedies."); <u>Guzman v. Denny's Inc.</u>, 40 F. Supp. 2d 930, (S.D. Ohio 1999) ("To hold that the entirety of § 2000a-3 is adopted is to impermissibly render superfluous the explicit textual reference to § 2000a-3(a)."); <u>Walker v. Asmar Ctr., LLC</u>, 2011 WL 5822394, at *6 (E.D. Mich. Nov. 15, 2011) (agreeing with Guzman and finding plaintiff was not required to exhaust administrative remedies); <u>Hill v. Park</u>, 2004 WL 180044, at *3 (E.D. Pa. Jan. 27, 2004) ("Section 12188(a)(1) is clear and unambiguous, and this Court should give the statute its plain meaning."); <u>Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower</u>, 2003 WL 1751785, at *10 (S.D.N.Y. Apr. 2, 2003) ("Plaintiffs were not required to notify state or local authorities prior to filing this suit."); <u>Stan v. Wal-Mart Stores, Inc.</u>, 111 F. Supp. 2d 119, 123 (N.D.N.Y. 2000) ("Because § 2000a-3(c) contains the exhaustion requirement, but was not incorporated into the ADA, the ADA does not mandate exhaustion prior to commencing suit.". See also, <u>McInerney v. Rensselaer Polytechnic Inst.</u>, 505 F.3d 135, 138 (2d Cir. 2007) ("ADA Title III incorporates only § 2000a-3(a)."); <u>Thomas v. Salvation Army S. Territory</u>, 841 F.3d 632, 638 (4th Cir. 2016) (finding the plaintiff's Title III ADA claims were "not subject to the administrative exhaustion requirement"). Filing a lawsuit to remedy architectural barriers, even without prior notice to the defendant or state agencies, constitutes a valid legal recourse to redress discrimination that allows the disabled to "fully participate in all aspects of society" 42 U.S.C. § 12101(a)(1) and (4). The purported "notice" requirements will discourage businesses and landlords from acting affirmatively on their own to review their premises

for potential barriers. Landlords and tenants will simply wait for a notice to review their premises. In other words, indeed of attempt to identify and remove accessibility barriers, landlords and tenants would wait for the disabled to provide "written notice" citing technical standards. In practice, this would result in less ADA compliance particularly in Puerto Rico where the issue of architectural barriers is alarming. Landlords and tenants should not wait a notice of an accessibility issue to act promptly to investigate the situation and determine what action can be taken to remove the barrier.

23. Defendant cannot show prejudice or intent to harass as a result of Plaintiff's request to pay attorney fees because Congress did indeed intentionally create an incentive for attorneys for ADA lawsuits , as the ADA itself does not provide monetary damages remedy.  Rather than spend taxpayers' money by setting up a bureaucratic agency to enforce Title III access laws and regulations, Congress left enforcement (other than by the U.S. Department of Justice in limited circumstances) to private lawsuits. Congress chose the right to recover attorney fees, litigation expenses, and costs as the incentive for attorneys to be willing to handle such cases without having to obtain from the (often low income) disabled plaintiffs. Without private lawsuits, public accommodations that still do not provide accessible facilities, would be able to continue to do so in perpetuity. Statutory attorneys' fees under the ADA are the "poor man's key to the courthouse." Otherwise only those persons rich enough to pay lawyers on an hourly basis could afford the costs of hiring counsel.  Congress recognized that private enforcement of civil rights legislation relies on the availability of fee awards: "If private citizens are to be able to assert their civil rights, and if those who violate the Nation[`s] fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs

them to vindicate these rights in court." S. Rep. No. 94-1011, at 2 (1976), as reprinted in 1976 U.S.C.C.A.N. 5908, 5910." [fn. omitted].  Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008). A settlement agreement may include an award of statutory attorney fees. See e.g. Lucas v. Kmart, (2006), WL 722166 (D. Colo.) (Nationwide class of disabled persons over inaccessibility of stores in violation of the Americans with Disabilities Act, agreeing to make changes to increase accessibility to its stores, both inside and outside the building; and agreeing to pay attorneys' fees incurred in connection with the matter up to and including the date of Final Approval of this Agreement by the Court in the amount of $3,250,000). Settlement Agreement, Lucas v. Kmart Corporation, Case No. 99-cv-01923-JLK-CBS (July 21, 2006).[6] Plaintiff's counsel attorney's fees and costs are obtained on a statutory basis from the defendants only, by judgment, or by settlement, and only if he wins the case. To hold that a contingent fee contract gives the attorney the beneficial rights of a real party in interest, would be to demean his profession and distort the purpose of the various acceptable methods of securing his fee.  If the disabled plaintiff is deemed to be "harassing" the defendant solely because his or her attorney is acting under a contingent fee contract, the natural consequence is that the disabled may go without counsel and, being a layman, may simply fail to assert what rights he or she has. Said practical effect of restricting an

---

[6] The Settlement Agreement also provides that Kmart shall pay "reasonable attorneys' fees and Costs incurred by Class Counsel after Final Approval of this Agreement for work performed by Class Counsel pursuant to this Agreement or as necessary to defend this Agreement. Kmart recognizes that such Costs include, but are not limited to, any fees, costs and expenses incurred by Class Counsel in retaining an expert to assist with such work." https://www.clearinghouse.net/chDocs/public/DR-CO-0005-0011.pdf (Document hosted by The Civil Rights Litigation Clearinghouse, at the University of Michigan Law School).

individual with disabilities access to the courts because of the contingency fee agreement, it contravenes the fundamental notions of equality and fairness, and Congress express intent to encourage enforcement of the law through private litigation.

24.     Standing. In <u>Suarez-Torres v. Borinquena Metro</u>, Civil No. 16-1609 (DRD) (Docket No. 12), the court noted that ADA testers are needed and that "the Court will not discourage persons from pointing out public accommodations that are breaking the law":

> Defendant also argues that Plaintiff's standing is questionable by explaining that she is a tester and that she has filed numerous ADA cases. See, Docket No. 10. Testers are needed to find out which establishments are not complying with the ADA. See <u>Iverson v. Braintree Prop. Assocs., L.P.</u>, No. 04cv12079–NG, 2008 WL 552652, at *3 n. 5. However, Plaintiff in this case also went to Defendant's business as a bona-fide patron. Nevertheless, even if Plaintiff were merely a tester, "several Circuits have gone further to specifically hold that a tester motive for a plaintiff's visit to a business does not negate ADA standing." <u>Marradi v. Galway House, Inc.</u>, 2014 WL 1454266, (D.Mass. Apr. 15, 2014)(citing <u>Braintree Prop. Assocs., L.P.</u>, 2008 WL 552652); see also <u>Tandy v. City of Wichita</u>, 380 F. 3d 1277, 1286–1288 (10th Cir.2004). Were testers to be negated standing, many businesses would be able to operate without following the ADA Guidelines. It follows that the Court will not discourage persons from pointing out public accommodations that are breaking the law. Accordingly, the Court finds reasons to believe that Plaintiff has shown a willingness to return and that it is plausible that she is suffering from an ongoing harm because of the alleged barriers on Defendant's property. Thus, Plaintiff Maria Suarez-Torres has standing to bring suit under the ADA.

This is a straightforward case under Title III of the Americans with Disabilities Act in which the Plaintiff seeks a prospective relief under Title III of the ADA. This case is not based on facts or theories that were previously found contrary to law in other cases. See e.g. <u>Medina-Rodriguez v. Fernandez Bakery, Inc. et al</u>, Civil No. 16-2578 (FAB) (D.P.R. June 14, 2017)(denying defendant's motion to dismiss under Rule 12(b)(6); <u>Caraballo-Rivera v. Farmacia Alejandro</u>, Civil No. 16-3123 (FAB) (denying motion to strike pleading); <u>Medina-Rodriguez v. China Temple, Inc. et al</u>, Civil No. 2579 (GAG) (Doc. 13) ("denying motion to dismiss under Rule

12(b)(6)"); Rodriguez-Vazquez v. Consejo de Titulares del Condominio Centro Comercial El Canton Mall, Civil No. 15-3633 (PAD)(BJM) (Docket No. 79) (Report and Recommendation noting that "the existence of a private right of action under section 12188(a)(1) does not depend upon how many attempts a plaintiff has made to overcome a discriminatory barrier, but, rather, upon whether the barrier remains in place.", quoting Dudley v. Hannaford Bros. Co., 333 F.3d 299, 305 (1st Cir. 2003); Suarez-Torres et al v. Restaurantes Fridas, Inc., Civil No. 16-1912 (FAB) (CVR) ("the Supreme Court has instructed courts to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, complaints by private persons are the primary method of obtaining compliance with the law."); Suarez-Torres et al v. Panaderia y Reposteria España, Inc. et al, Civil No. 1818 (PG) (denying defendant's motion to dismiss alleging lack of standing); Medina-Rodriguez v. Torres D' Pizza et al, Civil No. 2617 (GAG) (Doc 10) (denying motion to dismiss); Medina-Rodriguez v. El Platano Criollo, Inc. et al, Civil No. 3188 (ADC) (ECF No. 23) ("the issue of whether plaintiff has standing is a disputed issue of law and fact"); De Leon v. Vornado Montehiedra Acquisition LP, 166 F. Supp. 3d 171 (D.P.R. 2016) (denying motion to dismiss for lack of standing to bring their ADA claim because Plaintiffs are currently deterred from patronizing Montehiedra) (emphasis added) (quoting Equal Access, Inc. v. Ferries del Caribe, Inc., 405 F.3d 60, 64 (1st Cir.2005); Medina-Rodriguez v. Cooperativa de Farmacias Puertorriquenas et al, Civil 15-3185 (CCC) (denying motion to dismiss for lack of standing); Rivera-Quinones v. Rincon of the Seas Grand Caribbean Hotel, Civil No. 15-3146 (GAG)(SCC) (denying motion to dismiss).

        In Suarez-Torres v. Embutidos Dona Maria, Inc., Civil No. 16-1138 (ADC)(MEL)(Doc. 26) the Court entered an Order to Show Cause to the Plaintiff in said case. Order to Show Cause is not a substantive decision. In fact, after Plaintiff clearly explained in detail her right to sue that

*particular facility*, both under the ADA and Article III of the United States Constitution, the Court noted that it was before a "straightforward case" and referred the matter to a U.S. Magistrate Judge for a status and settlement conference. Subsequently, the parties reached a confidential settlement agreement that includes a remedial plan for the property for the benefit of said plaintiff and the society at large.

As noted by the First Circuit in <u>Dudley v. Hannaford Bros. Co.,</u> 333 F.3d 299 (1st Cir. 2003), the remedies contained in Title III are made available to:

> [A]ny person who is being subjected to discrimination on the basis of disability in violation of [Title III] .... Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

Id. § 12188(a)(1).

This "standing" provision is essential in regard to removing architectural barriers under the ADA. Under this specific statutory authority, the disabled does not have to personally enter (or visit the premises) of a <u>known </u>inaccessible facility to foreseeably be discriminated against. In other words, Congress set it up so that any disabled person with actual notice that a public facility did not provide legally required access would have standing to sue for an injunction to require that "readily achievable" access be made.

In Doran the Ninth Circuit correctly recognized that "each separate architectural barrier inhibiting access [by a person with a disability] to a public accommodation [is not] a separate injury that must satisfy the requirements of Article III." 524 F.3d 1034, 1042 (9th Cir. 2008). Thus, a plaintiff who suffered discrimination and "a legally cognizable injury for purposes of Article III standing," id. at 1043, when he encountered barriers to access may "conduct discovery to determine what, if any, other barriers affecting his or her disability existed at the time he or she brought the claim. This list of barriers would then in total constitute the factual

underpinnings of a single legal injury." Id. at 1044.

Moreover, it is not essential for a plaintiff to demonstrate that she will necessarily use all aspects or features of a public accommodation in order to seek injunctive relief concerning other barriers in the facility that are likely to affect her use of the facility in the future. What the statute guarantees is "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations," 42 U.S.C. 12182(a), which requires that an individual with a disability have the same access to all aspects of the public accommodation as do those without disabilities–even though, just like an individual without a disability, she may choose not to use all of them. Following this principle, courts have held that plaintiffs who establish that they are likely to use a public accommodation have standing to seek relief throughout the facility, not merely in those portions where they establish that they have gone in the past, or are certain to go in the future. See Steger v. Franco, Inc., 228 F.3d 889, 893-894 (8th Cir. 2000) (plaintiff "need not encounter all of these barriers to obtain effective relief."); Disabled Americans for Equal Access, Inc. v. Ferries del Caribe, Inc., 405 F.3d 60, 64-65 (1st Cir. 2005) (**plaintiff need not have traveled aboard Ferries' vessel in order to challenge barriers to his accessibility**).

In Long, 267 F.3d at 922-923, the Ninth Circuit awarded a plaintiff with a mobility impairment an injunction that required a hotel to bring the width of the bathroom doors in each of over 800 hotel rooms into compliance with ADA Standards for Accessible Design, even though the plaintiff had neither encountered the barrier to accessibility in each of those rooms nor was likely ever to do so. See also, e.g., Independent Living Res. v. Oregon Arena Corp., 982 F. Supp. 698, 762 (D. Or. 1997) (permitting plaintiff to seek relief for unencountered barriers in one action even though it "is unlikely that any individual plaintiff will ever sit in each of the seats in the arena, or use each of the restrooms, or attempt to reach each of the

ketchup dispensers in the arena"); Parr v. L & L Drive-Inn Restaurant, 96 F. Supp. 2d 1065,

1081 (D. Haw. 2000) ("Plaintiff should not be required to encounter every barrier seriatim * * *

to obtain effective relief.").

      The relevant inquiry in determining whether a plaintiff who has encountered a barrier

has standing to seek an injunction is whether he is likely to encounter barriers to access at the

relevant facility in the future. Whether she has been deterred from visiting the store by the

barriers she encountered in the past is not a necessary element of that inquiry. The concept that

a plaintiff may establish standing by showing that he was deterred from patronizing a facility

because of barriers he has encountered was first introduced in this circuit in Pickern v. Holiday

Quality Foods, Inc., 293 F.3d 1133 (9th Cir.), cert. denied, 537 U.S. 1030 (2002), a precedent

heavily cited by numerous courts, including Disabled Americans for Equal Access, Inc. v.

Ferries del Caribe, Inc., 405 F.3d 60, 64-65 (1st Cir. 2005) and Chapman v. Pier 1 Imports

(U.S.), Inc., 631 F.3d 939, 944 (9th Cir. 2011)(en banc).

      In Pickern, the district court had entered summary judgment in favor of the defendant

grocery store because the plaintiff, who had encountered barriers to access in the parking lot

that barred him from entering the store, had not attempted to enter the store again within the one

year period of the statute of limitations. On appeal, this Court held that when an individual with

a disability has actual knowledge of illegal barriers at a public accommodation to

> which he or she desires access, that plaintiff need not engage in the 'futile gesture' of
> attempting to gain access in order to show actual injury during the limitations period.
> When such a plaintiff seeks injunctive relief against an ongoing violation, he or she is not
> barred from seeking relief either by the statute of limitations or by lack of standing.

Pickern, 293 F.3d at 1135.[7]

---

[7] On the other hand, the clause in Section 308(a) that permits a suit by a person who is "about to be subjected to
discrimination," is designed to clarify that plaintiffs may challenge plans for buildings for which the design or

As further explained in its opinion, this Ninth Circuit's holding appeared to encompass two distinct circumstances. First, "a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.'" Pickern, 293 F.3d at 1138. In the following sentence, the Court stated, "[s]imilarly, a plaintiff who is threatened with harm in the future because of an existing or imminently threatened non-compliance with the ADA suffers 'imminent injury.'" Id. Taken together, the Court's statements suggest that (1) deterrence from even attempting to visit the store again because of the certainty that plaintiff could not gain access at all, or might suffer humiliation, burden, or danger in attempting to do so, is one way to show injury, and, (2) a plaintiff who might be able to obtain limited access to the facility, although he may not be able to take advantage of all of its services or accommodations, has still suffered an injury sufficient to satisfy constitutional Article III concerns because of the imminent threat of future injury from the continuing Title III violations. The Court correctly recognized in Pickern that the plaintiff's reluctance to return to the Holiday grocery store while the barriers to his accessibility remained – which the Court termed "deterrence" – did not negate his standing to seek injunctive relief against those barriers, and any others that he was unable to discover because he could not gain access. Pickern, 293 F.3d at 1138.

Subsequently, in Doran, the Court applied the concept of deterrence in the context of a statute of limitations challenge by the defendant. The Court permitted the plaintiff to challenge ADA violations that he did not know about when he filed his complaint, because he was deterred

---

construction is not yet complete. See 28 C.F.R. Pt. 36, App. B, subpart E, § 36.501. In such a case, the violation arguably has not yet occurred. It is only "about to" occur. By contrast, if, as here, the defendant has already constructed a facility that is not readily accessible to and usable by individuals with disabilities, the discrimination is already taking place. See 42 U.S.C. 12183(a)(1). Contrary to dictum in Pickern, 293 F.3d at 1136, therefore, there is no need for a plaintiff to rely on the "about to be subjected to discrimination" clause in order to maintain this action.

by the violations he did know about "from conducting further first-hand investigation of the store's accessibility." 524 F.3d 1034, 1042 (9th Cir. 2008). The Court acknowledged that Doran had visited the 7-Eleven once after filing suit, that he encountered the same access barriers on that occasion, and that he testified that those barriers "caused him 'a lot of frustration.'" Id. at 1040-1041. Although Doran further testified that he planned to return to the store after those barriers were fixed, his statement that the barriers continued to frustrate his ability to take full advantage of the store's facility on his subsequent visit was itself sufficient to demonstrate that he would suffer harm were he to decide to continue to patronize the store, and therefore, established his standing to seek an injunction.

In a footnote in Doran, responding to the dissent's contention that the majority opinion "conferr[ed] standing [on ADA plaintiffs] . . . for things that did not injure" them, 524 F.3d at 1024 n.5, the Court stated:

> Once a disabled individual has encountered or become aware of alleged ADA violations that deter his patronage of *or otherwise interfere with his access to a place of public accommodation*, he has already suffered an injury in fact traceable to the defendant's conduct and capable of being redressed by the courts, and so he possesses standing under Article III to bring his claim for injunctive relief forward. *See Lujan*, 504 U.S. at 560-61.
>
> Id. (emphasis added).

That formulation recognizes that both deterrence from future visits and continued "interfere[nce] with" access during subsequent visits are proper bases for demonstrating that a plaintiff has standing to seek injunctive relief for a violation of Title III of the ADA.[8] A plaintiff who is threatened with harm in the future because of existing or imminently threatened noncompliance

---

[8] The prudential principle that places limitations on a litigant's ability to raise another person's legal rights is not implicated here because Plaintiff is seeking relief to vindicate his own right to full and equal enjoyment of the facility without discrimination based on his mobility impairments.

with the ADA suffers "imminent harm." So long as a plaintiff can show both that he intends to use a covered facility in the future and that the facility is inaccessible in a manner that is likely to affect his use of it, he has established a "sufficient likelihood" of future injury to meet Article III's standing requirements. Summers v. Earth Island Inst., 129 S. Ct. 1142, 1149 (2009).

In our view, the court should not read Pickern, Disabled Americans for Equal Access, and Doran as converting deterrence from a sufficient showing for standing into a necessary element for obtaining standing. As so applied, the requirement that a Title III ADA plaintiff allege and prove that she has been completely deterred from visiting the place of public accommodation, and has not visited since filing his complaint, unnecessarily denies an individual with a disability the right to take advantage of the goods and services of a place of public accommodation, to the extent he can do so, even while barriers to full accessibility remain. If a plaintiff is likely to visit a covered facility in the future, he should have standing to seek relief to remove any barriers that may reasonably impede his access throughout the store, even if he is willing to accept less than full access while the case is working its way through the judicial system.

Policy considerations militate strongly in favor of recognizing deterrence claims under the ADA. Otherwise, the most egregious violators would largely escape enforcement of the law, where it is well-known that a particular establishment has no adequate accommodations for disabled persons, few disabled would-be patrons would make the futile and probably humiliating gesture of showing up and asking to be accommodated. Indeed, unlike most employment cases where the deterring conduct is largely subjective and is subject to differing interpretations, the existence of, for instance, an architectural disability access barrier is an objectively ascertainable fact and therefore is even more likely to have a deterring effect. Failing to recognize deterrence

based claims would significantly reduce the incentives for compliance with the disability access requirements of these laws. *See* Houston v. Marod Supermarkets, Inc., 733 F.3d 1323 (11th Cir. 2013) (a plaintiff's status as a tester does not automatically deprive him of standing to maintain a suit for injunctive relief under the ADA so long as the plaintiff meets the elements of standing). See also, Medina-Rodriguez v. Fernandez Bakery, Inc. et al, Civil No. 16-2578 (FAB) (D.P.R. June 14, 2017).

## CAUSE OF ACTION

### Americans with Disabilities Act of 1990

#### Denial of "Full and Equal" Enjoyment and Use

25.   Plaintiff incorporates the allegations contained in paragraphs 1 through 24.

26.   Title III of the ADA holds as a "general rule" that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

27.   Defendants discriminated against Plaintiff by denying Plaintiff "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the Facility during each visit and each incident of deterrence.

#### Failure to Remove Architectural Barriers in an Existing Facility

28.   The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

29.   When an entity can demonstrate that removal of a barrier is not readily achievable, a failure to make goods, services, facilities, or accommodations available through

alternative methods is also specifically prohibited if these methods are readily achievable. Id. § 12182(b)(2)(A)(v).

30.   Here, Plaintiff alleges that Defendants can easily remove the architectural barriers at the Facility without much difficulty or expense, and that Defendants violated the ADA by failing to remove those barriers, when it was readily achievable to do so.

31.   In the alternative, if it was not "readily achievable" for Defendants to remove the Facility's barriers, then Defendants violated the ADA by failing to make the required services available through alternative methods, which are readily achievable.

<u>Failure to Design and Construct an Accessible Facility</u>

32.   Plaintiff alleges on information and belief that the Facility was designed and constructed (or both) after January 26, 1992 – independently triggering access requirements under Title III of the ADA.

33.   The ADA also prohibits designing and constructing facilities for first occupancy after January 16, 1993, that aren't readily accessible to, and usable by, individuals with disabilities when it was structurally practicable to do so. 42 U.S.C. § 12183(a)(1).

34.   Here, Defendants violated the ADA by designing and constructing (or both) the Facility in a manner that was not readily accessible to the physically disabled public – including Plaintiff – when it was structurally practical to do so.

<u>Failure to Make an Altered Facility Accessible</u>

35.   Plaintiff alleges on information and belief that the Facility was modified after January 26, 1992, independently triggering access requirements under the ADA.

36.   The ADA also requires that facilities altered in a manner that affects (or could affect) its usability must be made readily accessible to individuals with disabilities to the maximum

extent feasible. 42 U.S.C. § 12183(a)(2). Altering an area that contains a facility's primary function also requires making the paths of travel, bathrooms, telephones, and drinking fountains serving that area accessible to the maximum extent feasible. Id.

37.     Here, Defendants altered the Facility in a manner that violated the ADA and was not readily accessible to the physically disabled public – including Plaintiff – to the maximum extent feasible.

<u>Failure to Modify Existing Policies and Procedures</u>

38.     The ADA also requires reasonable modifications in policies, practices, or procedures, when necessary to afford such goods, services, facilities, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter their nature. 42 U.S.C. § 12182(b)(2)(A)(ii).

39.     Here, Defendants violated the ADA by failing to make reasonable modifications in policies, practices, or procedures at the Facility, when these modifications were necessary to afford (and would not fundamentally alter the nature of) these goods, services, facilities, or accommodations.

40.     Plaintiff seeks all relief available under the ADA (i.e., injunctive relief, attorney fees, costs, legal expense) for these aforementioned violations. 42 U.S.C. § 12205.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for:

A.  A declaratory judgment that Defendant is in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant's facilities, as described above, are not fully accessible to, and independently usable by, individuals who use wheelchairs or limited mobility;

B.  A declaratory judgment that That the Court's preliminary screening pursuant to 28 U.S.C. § 1915(e) is limited to cases filed in forma pauperis; that accessibility lawsuits under Title II or Title III of the ADA are not subject to a heightened pleading standard or a requirement of greater specificity for particular claims; that defendants cannot show prejudice or intent to harass for lack or prior notice of any ADA deficiency or administrative notice to a state or local authority or lack of prior notice the defendant; that defendant cannot show prejudice or that the Plaintiff intents to "harass" the defendant because his or her attorney is acting under a contingent fee contract to recover statutory attorney fees and costs.

C.  A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504 (a) which directs Defendant to take all steps necessary to remove the architectural barriers described above and to bring its facilities into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its facilities are fully accessible to, and independently usable by, individuals who use wheelchairs or individuals with limited mobility, and which further directs that the Court shall retain jurisdiction for a period to be determined after Defendant's facilities come into compliance with the relevant requirements of the ADA to ensure that Defendant has adopted and is following an institutional policy that will in fact cause Defendant to remain fully in compliance with the law;

D.  Payment of costs of suit;

E.  Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505; and,

F.  The provision of whatever other relief the Court deems just, equitable and appropriate.

**RESPECTFULLY SUBMITTED**,

**/S/JOSE CARLOS VELEZ-COLÓN, ESQ.**
**USDC-PR NO.: 231014**
jcvelezcolon@gmail.com

PO BOX 2013
BAYAMON PR 00960

TEL: (787) 599-9003

*Attorney for Plaintiff*